IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ACI WORLDWIDE CORP., <br><br> Plaintiff, <br><br> vs. <br><br> CHURCHILL LANE ASSOCIATES, LLC, <br><br> Defendant. | 8:14CV249 <br><br> ORDER |

This matter is before the Court on the Renewed Motion to Compel Post-Termination Royalty Discovery ([Filing No. 205](#)) filed by Defendant and Counter-Plaintiff, Churchill Lane Associates, LLC ("Churchill"). The issues raised by Churchill's renewed motion have been extensively discussed between the parties and the Court. Most recently, the Court held a telephone conference on July 12, 2018, regarding any outstanding issues the parties were unable to resolve after their meet and confer. Prior to the telephone conference, the parties prepared a discovery dispute chart as directed by the Court, attached as Exhibit A to this Order. Churchill also submitted a letter to the Court on June 27, 2018, attached as Exhibit B, requesting clarification of the Court's prior Order, which was also discussed during the July 12, 2018, telephone conference. Upon review of the chart at Exhibit A, and after consideration of the parties' arguments during the telephone conference and briefs and evidence previously submitted with respect to Churchill's first motion to compel ([Filing No. 135](#)), the Court makes the following rulings:

**Interrogatory No. 13**

Churchill requests that ACI Worldwide Corp. ("ACI") "fully answer Interrogatory No. 13 of Churchill's Third Set of Interrogatories by identifying all New Technology customers as of July 21, 2014, including, but not limited to, the group of On Demand customers that ACI identified during the conference with the Court on July 12, 2018, as being withheld from discovery by ACI."

The "On Demand" category of customers, as explained by counsel for ACI during the telephone conference, include individuals who have the "option" to use "PRM" (a/k/a "New Technology") but never exercised the option and therefore were never licensees. Counsel for ACI

therefore object to identifying these "On Demand" customers as not being relevant since this group has a "contractual right" to access ACI's database to use the PRM but are not "licensees" under the Licensing Agreement.

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). The scope of permissible discovery is extremely broad. "Discovery requests should be considered relevant if there is any possibility the information sought is relevant to any issue in the case and should ordinarily be allowed, unless it is clear the information sought can have no possible bearing on the subject matter of the action." *Met-Pro Corp. v. Industrial Air Technology, Corp.*, No. 8:07CV262, 2009 WL 553017, * 3 (D. Neb. March 4, 2009).

Considering the broad scope of permissible discovery, the Court will compel ACI to identify the "On Demand" category of customers as requested by Churchill. As explained to the Court, these "On Demand" customers paid a fee for the "contractual right" to access ACI's database to use PRM. Although ACI's counsel indicated many of these customers may have never used PRM despite having the contractual right to do so, it is possible that the district judge may ultimately conclude that ACI must pay royalties on fees paid by those customers, regardless of whether ACI and ACI affiliates considered those customers licensees or sublicensees. In identifying such "On Demand" customers, ACI should also disclose whether those customers exercised the option to use PRM.

**Interrogatory No. 14**

Churchill requests that ACI "fully answer Interrogatory No. 14 of Churchill's Third Set of Interrogatories by identifying, for each customer with a sublicense for the New Technology that was granted before and still in effect as of July 21, 2014, the date the customer first licensed the New Technology and the date (if any) the customer stopped licensing the New Technology." Churchill represents this information cannot be readily determined from ACI's document production.

ACI responds that it "incorporates its initial objections and answer to Interrogatory No. 14," including that the interrogatory is "vague and unduly burdensome because it contains no date

limitation." Based on that objection, ACI further stated that "to the extent this Interrogatory seeks the date when each customer originally sublicensed New Technology or asks about customers who were no longer licensing the New Technology as of July 21, 2014, ACI Worldwide provides no response." (Filing No. 138-4 at p. 8). ACI answers that "information responsive to these requests is contained in documents which have been produced by ACI Worldwide and are incorporated herein pursuant to Fed. R. Civ. P. 33(d). Specifically, . . . master agreements, attachments, and termination notices containing the requested information." Churchill denies that the information can be readily determined from ACI's document production.

To the extent ACI maintains its objections that Churchill's request is vague and burdensome because it does not contain a date limitation, that objection is overruled. Churchill's request is limited to "each customer with a sublicense for the New Technology that was granted before and still in effect as of July 21, 2014[.]" Such request is not vague, nor does ACI provide evidence of its burden to answer that request. The information sought by this interrogatory was deemed relevant by Chief Judge Smith Camp when denying ACI's motion for summary judgment. See Filing No. 182 at p. 18 (denying summary judgment "pending further discovery regarding the sublicenses granted by ACI affiliates before termination of the Licensing Agreement, and the status of ACI's, or its affiliates', current contractual relationship with those customers").

To the extent ACI asserts that Churchill can find the information responsive to this interrogatory in ACI's document production, ACI shall be required to identify by Bates number the specific records from which Churchill can ascertain the starting and ending dates that each customer licensed the New Technology. Pursuant to Fed. R. Civ. P. 33(d), "If the answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing a party's business records, . . . the responding party may answer by . . . specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could[.]" Fed. R. Civ. P. 33(d). "While Fed. R. Civ. P. 33 permits a party to respond to interrogatories by producing business records, the records must be described in sufficient detail to enable the requesting party to readily identify them." *W. Plains, L.L.C. v. Retzlaff Grain Co. Inc.*, No. 8:13CV47, 2014 WL 2515198, at *4 (D. Neb. June 3, 2014). Accordingly, ACI shall provide a complete answer to this interrogatory, either by answering in

full, or by identifying the specific documents Churchill must review to readily locate the requested information.

### Request for Production Nos. 82, 94, and 95

Churchill's Request for Production No. 82 requests "Complete copies, including all attachments and exhibits, of all contracts for the license, use and/or maintenance of the New Technology for all ACI customers that were using the New Technology as of June 30, 2014 (in English)." ([Filing No. 138-5 at p. 2](Filing No. 138-5 at p. 2)). The Court previously denied Churchill's motion to compel as to this request, subject to reassertion after it reviewed ACI's supplemental production of relevant master agreements with attachments. Churchill has renewed its motion to compel, requesting complete copies of all contracts for the license of the New Technology for all customers as of June 30, 2014. This request includes "all non-PRM attachments executed after July 21, 2014, for customers that were licensing the New Technology as of July 21, 2014." ACI states it will not produce any non-PRM attachments to master agreements.

Relatedly, Churchill's Request for Production Nos. 94 and 95 seek other documents Churchill asserts are necessary to calculate a 15% payment on the license, use and/or maintenance of the New Technology on sublicenses granted by ACI prior to July 21, 2014, and on extensions or renewals. ([Filing No. 138-5 at pp. 11-12](Filing No. 138-5 at pp. 11-12)). Specifically, Churchill requests production of both PRM price books and non-PRM price books dating back to February 2001. Churchill asserts that these price books are required to determine "[T]he amount of royalties due for processing services agreements under Amendments 1 and 2, which are calculated using PRM price books, and to determine the discount to be applied under the Licensing Agreement." ACI represents that it has produced PRM price books dating back to August 2015, but will not produce PRM price books prior to August 2015, nor will ACI produce any non-PRM price books.

Churchill maintains that it needs information regarding non-PRM attachments and non-PRM price books to calculate the discount under Section 1.5 of Attachment A to the Licensing Agreement, which provides:

> ACI shall pay to Nestor 15% of all fees paid for license and maintenance (however denominated) of the Software Products from sub-licensing the Software Products or software containing any part of the Software Products, provided however for purposes of calculating the amount due Nestor in any individual sublicense, ACI shall not consider any discount of the list price of the Software Programs to a greater degree than the discount off the list price of any other ACI software that is

4

> also licensed at the time of or in conjunction with such sublicense (e.g. if the discount on the Software Programs is 20% and the discount on the other ACI software is 10%, then for purposes off [sic] calculating the amount due Nestor the Software Programs shall only be discounted 10%).

([Filing No. 52 at p. 17](Filing No. 52 at p. 17)). Churchill states that the "list price" is contained in the price books, and that many contracts pre-date the August 2015 price books provided by ACI. Churchill requests ACI produce price books that existed on the day the contracts were entered into. Churchill's request is limited to the universe of customers that existed of July 21, 2014.

The Court finds that Churchill has made a threshold showing of relevance of non-PRM attachments and non-PMR price books for customers of ACI and ACI affiliates existing as of July 21, 2014. ACI does not object that this information is privileged; rather, ACI's primary objection is that this information is not relevant. Part of ACI's relevance objection is premised on its narrow reading of the Eighth Circuit opinion in this case. However, Section 1.5 of Attachment A to the Licensing Agreement specifically contemplates that the discount provided by ACI for non-PRM products is to be taken into consideration when calculating royalties. Accordingly, ACI shall produce supplemental documents responsive to these requests, which includes, for customers that were licensing New Technology as of July 21, 2014: copies of all contracts (including non-PRM attachments including those executed after July 21, 2014); and both PRM and non-PRM price books for those contracts that contain the list price as of the date the contract was executed.

**Request for Production No. 83**

Churchill's Request for Production No. 83 seeks copies of "all contract renewals, extensions, amendments, appendices, exhibits, and changes of any kind, including agreements for capacity increases cancellations, or replacement agreements related to all contracts for the license, use and/ or maintenance of the New Technology for all ACI's customers that were using the New Technology as of June 30, 2014." Specifically, Churchill seeks the metadata that shows the date electronic copies of the mutual terminations were created and by whom. The Court previously denied this request, without prejudice, subject to reassertion if ACI's supplemental production did not include evidence regarding when the mutual terminations were drafted and executed.

ACI responds by "admit[ting] that the mutual terminations were executed after the Eighth Circuit issued its opinion in this case and were retroactively effective to July 21, 2014."

5

Therefore, ACI asserts it will not produce metadata related to the mutual terminations because "Additional information concerning the date the mutual terminations were drafted and executed and by whom is not relevant." At the time of the telephonic hearing in this matter, ACI had not yet provided the actual dates the Mutual Terminations were executed.

Chief Judge Smith Camp previously explicitly ruled that this area of discovery is relevant and denied ACI's partial motion for summary judgment pending further discovery: "To the extent ACI entered into contracts with affiliates for the affiliates to sublicense the New Technology, ACI and some or all of its affiliates executed more terminations of some or all of these contracts at some point in time. However, more specific evidence of these terminations, save one, is not before the Court." ([Filing No. 182 at pp. 12-13](#)). Judge Smith Camp found that ACI counsel's affidavit with a "summary" of the status of Mutual Terminations between ACI and an ACI affiliate was deficient because it provided

> no information regarding the date on which, or the mechanism whereby, these sublicenses were terminated. As with the purported termination of the ACI Asia agreement, the Court cannot rule on any alleged retroactive dating of the listed agreements, or the effects on Churchill's rights. The Court will grant Churchill's 56(d) motion and deny ACI's motion for summary judgment pending further discovery regarding the sublicenses granted by ACI affiliates before termination of the Licensing Agreement, and the status of ACI's, or its affiliates', current contractual relationship with those customers.

([Filing No. 182 at pp. 15-16](#)).

The Court has not yet conclusively ruled whether Churchill is correct in its position that "any use of the New Technology by ACI Affiliates' customers is still subject to the royalty obligation, regardless of Mutual Terminations between ACI and its affiliates, and that ACI's backdating of the Mutual Terminations . . . impairs Churchill's rights to any fees that accrued between July 21, 2014, and the date—known only to ACI and its affiliates—the Mutual Terminations were executed." ([Filing No. 182 at p. 12](#)). Judge Smith Camp therefore found that "the date when the Mutual Termination was actually executed is relevant;" and denied ACI's partial motion for summary judgment pending further discovery on that issue. ([Filing No. 182 at p. 15](#)).

As of the July 12, 2018, telephone conference, ACI had still not provided Churchill with evidence showing the date that the Mutual Executions were drafted and executed. Accordingly, the Court will compel ACI to produce all metadata associated with the documents responsive to

this Request so that Churchill can determine the dates when Mutual Terminations were drafted and executed.

**Request for Production No. 85**

Churchill's Request for Production No. 85 requests "All documents and emails relating to all invoices produced by ACI for the license, use and/or maintenance of the New Technology from July 21, 2014 through the present, which includes the amount due, from whom, and the invoice date." Churchill is not requesting emails related to invoices at this time, but is requesting that ACI produce all invoices, including invoices issued by ACI Affiliates and invoices on renewals and extensions.

ACI represents that it has produced invoices related to customer contracts that existed as of July 21, 2014, involving ACI Worldwide Corp. ACI states it "will not produce invoices on renewals, extensions, capacity increases, etc. that were executed after July 21, 2014" nor will ACI "produce invoices for customers of ACI Affiliates." ACI's argument is premised on its assertion that it terminated all affiliate contracts "retroactively," and therefore Churchill's request is not relevant.

As discussed during the telephone conference in response to Churchill's request for clarification set forth in paragraph 2.a. of its letter (Exhibit B), the Court's previous orders contemplated that invoices for both ACI and ACI affiliates should be produced. As stated above, Chief Judge Smith Camp has not yet determined the legal effect of ACI's retroactive mutual terminations and denied ACI's motion for summary judgment pending further discovery on that issue. Therefore, ACI's objections on relevance are overruled. Accordingly, Churchill's motion will be granted as to this request and ACI shall be compelled to produce all invoices for customers of ACI *and* ACI affiliates through the present, regardless of when such invoices were generated.

**Request for Production Nos. 86**

Churchill's Request for Production No. 86 requests "All documents and emails relating to all fees paid to ACI by ACI's customers for the license, use and/ or maintenance of the New Technology from July 21, 2014 through the present, which includes the amount paid, by customer name, and date." Specifically, Churchill requests that ACI produce "Oracle" reports from July 21, 2014, to the present date because such reports "will provide a comprehensive listing of invoices

7

ACI sent to customers for PRM a/k/a New Technology." Churchill asserts that Oracle can be used to generate a report of all invoices sent to customers for the product and that ACI's representative testified during her deposition that ACI itself used Oracle reports to calculate royalties due to Churchill. ([Filing No. 154-1 at p. 4](#)). Churchill further asserts that, because ACI has not produced all the relevant invoices, the Oracle report will serve as a check for Churchill to confirm that ACI has identified all relevant customers and produced all relevant invoices.

ACI objects to producing Oracle reports because documents that contain the relevant information reflected in the Oracle database have already been produced in the form of invoices. According to ACI, Oracle is a database; ACI does not generate any Oracle "reports" in the ordinary course of business. Reports may be generated using certain search parameters to search within the database. ACI asserts that its accounting department previously provided Churchill with an Excel spreadsheet that contained much of the same information as would be contained in an Oracle report. Churchill disagrees with the usefulness of the Excel spreadsheet because it does not provide itemization of invoices.

The Court is persuaded that Churchill's request for Oracle reports for PRM customers from July 21, 2014, through the present, is reasonable and proportional to the needs of the case. ACI did not present evidence as to the cost or burden of producing the requested reports, and in fact ACI's deposition representative testified that ACI itself used such reports to calculate royalties paid to Churchill. Production of the requested reports will eliminate any lingering doubts that Churchill has not received invoices it should have received or that PRM customers that should have been identified were not. Accordingly,

**IT IS ORDERED:**

1. Churchill's Renewed Motion to Compel Post-Termination Royalty Discovery ([Filing No. 205](#)) is granted, as set forth above.

2. Within twenty-one (21) days of this Order, ACI shall supplement is document production as set forth in this Order.

DATED this 20th day of August, 2018.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge